**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Kristen Behne, | Case No. _____ |
| Plaintiff, | **COMPLAINT AND JURY DEMAND** |
| v. | **(Jury Trial Demanded)** |
| Chipotle Mexican Grill, Inc., | |
| Defendant. | |

Plaintiff Kristen Behne, by and through her attorneys, for her Complaint against Defendant Chipotle Mexican Grill, Inc., states and alleges as follows:

## INTRODUCTION

1. Eleven years ago, Chipotle served *Salmonella*-contaminated fresh produce to Minnesota diners and sickened 64 of them. In the wake of this shocking outbreak, Chipotle told the public it had learned its lesson. But we now know that it did not.

2. In 2020, Chipotle paid a $25 million criminal fine—the largest food-safety fine in American history—to resolve federal charges that it had shipped and served adulterated food to more than 1,100 customers. Again, Chipotle told the public it had learned its lesson. Again, we now know it did not.

3. In the summer of 2026, public health officials detected a surge of *Salmonella* Javiana illnesses. Investigation soon revealed that, yet again, contaminated produce prepared and sold by Chipotle had caused another *Salmonella* outbreak.

4. Public health authorities have now linked at least 212 illnesses nationally, and at least 110 illnesses in Minnesota, to the outbreak. In the face of this overwhelming evidence,

Chipotle acknowledged that it caused the outbreak and traced the contamination to jalapeño peppers from a single common lot—peppers it had distributed to its restaurants and served to its customers. The number of customers sickened and the number of states impacted is likely to substantially increase.

5.    Plaintiff Kristen Behne is one of the people Chipotle poisoned.

6.    On June 24, 2026, she ate a burrito bowl from Chipotle's Roseville, Minnesota restaurant. Three days later she was in a hospital bed, febrile, tachycardic, and septic—a life-threatening complication of the *Salmonella* infection caused by Chipotle's grossly contaminated food. She has not been the same since.

7.    Plaintiff's case does not turn on inference or circumstantial evidence. The *Salmonella* Javiana recovered from Plaintiff's body has been whole genome sequenced, deposited in the National Center for Biotechnology Information's Pathogen Detection database under isolate designation PNUSAS585266, and placed by federal scientists inside the very genomic cluster that defines this outbreak—SNP cluster PDS000268094. At the level of its DNA, the bacterium that put Plaintiff in a hospital bed is undisputedly the outbreak strain—the strain of *Salmonella* that caused this cluster of human illnesses.

8.    The cluster associated with the outbreak strain now contains at least 327 sequenced isolates. Every one of them is clinical—that is, every one was recovered from a sick human being. The common food consumed by these outbreak victims was jalapeño peppers sourced, prepared, and sold by Chipotle.

9.    Ms. Behne did nothing wrong. She could not have inspected her food for *Salmonella*; the pathogen is invisible, odorless, and tasteless. She was entitled to rely—and did

rely—on Chipotle's representations that the food it prepared and sold was safe to eat. Those representations were false.

10.     Plaintiff brings this action to recover the full measure of damages caused by Chipotle's defective product and its negligence.

## PARTIES

11.     Plaintiff Kristen Behne is a resident and citizen of the State of Minnesota.

12.     Defendant Chipotle Mexican Grill, Inc. ("Chipotle") is a corporation organized and existing under the laws of the State of Delaware, with its corporate headquarters and principal place of business located at 610 Newport Center Drive, Suite 1100, Newport Beach, California 92660. Chipotle's nerve center—the place where its officers direct, control, and coordinate the corporation's activities—is located in Newport Beach, California. Accordingly, Chipotle is a citizen of the State of Delaware and of the State of California. Chipotle is not a citizen of the State of Minnesota.

13.     Chipotle's Minnesota registered agent for service of process is Corporation Service Company, 2780 Snelling Avenue North, Suite 101, Roseville, Minnesota 55113.

14.     Upon information and belief, Chipotle owns, operates, staffs, supplies, and controls the Chipotle restaurant located at 2325 Fairview Avenue North, Roseville, Minnesota 55113 (the "Roseville Chipotle"). The Roseville Chipotle is a company-operated restaurant; it is not a franchise.

15.     Chipotle does not franchise its restaurants in the United States. Every Chipotle restaurant in the United States, including the Roseville Chipotle, is owned and operated by Chipotle or by an entity that Chipotle wholly owns and controls. Chipotle has publicly and

3

repeatedly stated that it retains ownership and operational control of all of its domestic restaurants rather than licensing them to independent franchisees.

16.     To the extent any wholly owned subsidiary or affiliate of Chipotle Mexican Grill, Inc., held title to, held licenses for, employed personnel at, or otherwise participated in the operation of the Roseville Chipotle, such entity acted as the agent, servant, and/or instrumentality of Chipotle Mexican Grill, Inc., within the course and scope of that agency, and Chipotle Mexican Grill, Inc. is responsible for its acts and omissions. Upon information and belief, any such entity is wholly owned, directly or indirectly, by Chipotle Mexican Grill, Inc., such that its members are citizens of Delaware and California and not of Minnesota. Plaintiff reserves the right to amend this Complaint to add any such entity upon its identification.

17.     Upon information and belief, one or more growers, processors, packers, and/or distributors supplied Chipotle with the contaminated produce described in this Complaint. The identity of that supplier or those suppliers is presently known to Chipotle but not to Plaintiff, and has not been disclosed publicly by Chipotle or by federal or state authorities. Plaintiff reserves the right to amend this Complaint to name such parties upon their identification through investigation or discovery.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiff and Defendant.

19.     This Court has personal jurisdiction over Chipotle because Chipotle is registered to do business in Minnesota, maintains a registered agent in Minnesota, owns and operates dozens of

restaurants in Minnesota, and because Plaintiff's claims arise directly out of Chipotle's Minnesota activities.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this district within the meaning of 28 U.S.C. § 1391(c)(2), Minnesota comprising a single judicial district, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims asserted occurred in this district.

## FACTUAL BACKGROUND

### *Salmonella* and Salmonellosis

21.     *Salmonella* is a bacterium that lives in the intestinal tracts of humans and other animals and is shed in their feces. Food becomes contaminated with *Salmonella* when it comes into contact, directly or indirectly, with fecal matter.

22.     When *Salmonella* is ingested by humans, it can cause a severe gastrointestinal illness called salmonellosis. Symptoms include nausea, vomiting, diarrhea (often bloody), and abdominal cramping. Headache, myalgia, chills, and fever frequently accompany the illness.

23.     According to the Centers for Disease Control and Prevention ("CDC"), symptoms of salmonellosis typically begin between six hours and six days after the contaminated food is consumed. Symptoms usually last four to seven days, but severe cases last considerably longer and result in serious medical complications.

24.     When infection is severe, *Salmonella* may escape the intestines and invade the bloodstream—a condition known as bacteremia. Bacteremia can progress to sepsis, a life-threatening dysregulated immune response to infection that causes organ dysfunction and, in a significant percentage of cases, death. Invasive salmonellosis can also seed infection in the bones, joints, heart valves, and central nervous system.

25.     Salmonellosis is also a recognized cause of serious long-term sequelae, including reactive arthritis (Reiter's syndrome), post-infectious irritable bowel syndrome, inflammatory bowel disease, and persistent immunological and gastrointestinal dysfunction.

26.     The CDC estimates that *Salmonella* causes approximately 1.35 million infections, 26,500 hospitalizations, and 420 deaths in the United States every year, and that food is the source of most of these illnesses.

27.     Because *Salmonella* is colorless, odorless, and tasteless, and because it is present at a microscopic scale, a consumer has no ability to detect its presence in food before eating it.

28.     There is no consumer-level "kill step" for *Salmonella* on ready-to-eat fresh produce. Unlike raw meat or poultry, produce served raw—such as jalapeño peppers in a fresh salsa—is never subjected to a cooking step capable of destroying the pathogen. Contamination that reaches the restaurant reaches the consumer.

29.     For this reason, the entire burden of preventing *Salmonella* contamination of ready-to-eat produce falls on the producers, processors, distributors, and food service operators in the supply chain—including Chipotle.

30.     Because *Salmonella* contamination is such a well-known and long-documented risk in the production and handling of fresh produce, responsible producers and restaurant operators have long adopted food safety programs designed to prevent *Salmonella* contamination, to vet and audit their suppliers, and to detect *Salmonella* before contaminated product reaches consumers.

### *Salmonella* Javiana and Fresh Produce

31.     *Salmonella enterica* serotype Javiana ("*Salmonella* Javiana") is among the most common *Salmonella* serotypes causing human illness in the United States, and consistently ranks among the top five serotypes reported to the CDC's national surveillance systems.

32.    *Salmonella* Javiana is strongly associated with contaminated fresh produce. Public health investigators have repeatedly traced *Salmonella* Javiana outbreaks to raw fruits and vegetables, including tomatoes, cucumbers, melons, sprouts, and peppers.

33.    Peppers—including jalapeño peppers—are a recognized high-risk produce commodity for *Salmonella* contamination. In 2008, a nationwide *Salmonella* Saintpaul outbreak that sickened more than 1,400 people across 43 states was ultimately traced to jalapeño and serrano peppers grown in Mexico. That outbreak is among the largest foodborne outbreaks in modern United States history and is well known throughout the food industry.

34.    Since the 2008 jalapeño outbreak, the risk that hot peppers may carry *Salmonella* has been a matter of settled knowledge within the food industry, the produce industry, and the public health community. The United States Food and Drug Administration ("FDA") has published guidance directed specifically at the safe production and handling of fresh peppers.

35.    Contamination of peppers typically occurs in the field or at the packing house, through contact with contaminated irrigation or wash water, contaminated soil amendments, animal intrusion, or unsanitary handling by workers. Because peppers are consumed raw, such contamination is not eliminated downstream.

36.    Consequently, a purchaser of fresh peppers intended for raw consumption—such as Chipotle—has a duty to know its growers, to audit its suppliers, to require and verify compliance with the FDA Produce Safety Rule and applicable Good Agricultural Practices, and to obtain and review supplier food safety documentation and test results before serving the product to the public.

### Outbreak Detection and Whole Genome Sequencing

37.    Because of the severe health consequences and substantial public health costs associated with *Salmonella*, the CDC, the FDA, and state health departments—including the

7

Minnesota Department of Health ("MDH")—actively conduct surveillance of *Salmonella* infections nationwide in order to identify the food causing illness and stop outbreaks.

38.     Minnesota is widely recognized as having among the most sophisticated foodborne illness surveillance and outbreak investigation programs in the United States. MDH routinely identifies outbreaks that would go undetected in other jurisdictions.

39.     State public health laboratories and the CDC routinely perform whole genome sequencing ("WGS") on *Salmonella* isolates recovered from ill patients. WGS determines the complete DNA sequence of a bacterial isolate's genome.

40.     By comparing the genomes of isolates recovered from different patients, public health scientists can determine whether those patients were infected by the same strain of bacteria. Isolates that are closely related genetically—typically differing by only a small number of single nucleotide polymorphisms—are highly likely to share a common source. WGS results are uploaded to national databases, including PulseNet, which permits real-time detection of clusters of genetically related illnesses across state lines.

41.     In the United States, WGS data generated by state public health laboratories and the CDC is deposited into the National Center for Biotechnology Information ("NCBI") Pathogen Detection system, a database operated by the National Institutes of Health. NCBI continuously analyzes every submitted genome and automatically assigns closely related isolates to numbered single nucleotide polymorphism clusters, designated with a "PDS" prefix.

42.     Assignment to the same NCBI SNP cluster means that the isolates share a recent common ancestor and are, in the judgment of the automated phylogenetic analysis, too closely related to have arisen independently. In foodborne outbreak investigations, SNP cluster

membership is the genomic evidence that ties individual patients to one another and to a shared contaminated food source.

43.   Clinical isolates submitted through the CDC's PulseNet network are assigned strain designations beginning with the prefix "PNUSAS" for *Salmonella* isolates recovered from human patients. An isolate bearing a PNUSAS designation is, by definition, an isolate cultured from a sick person rather than from food or the environment.

44.   WGS is the accepted scientific standard for linking human illnesses to one another and to a common contaminated food source. When public health authorities determine that a group of patients was infected with a genetically indistinguishable strain, and epidemiologic investigation identifies a common food exposure among those patients, the resulting conclusion is a reliable identification of the outbreak vehicle.

### Chipotle Knew: Its Documented History of Serving Contaminated Food

45.   Chipotle did not stumble into the 2026 outbreak. It arrived there with more than a decade of actual knowledge that its food safety systems—and in particular its produce sourcing and handling systems—were inadequate to protect its customers from foodborne pathogens.

46.   Chipotle markets itself to the public on the strength of its fresh, raw, minimally processed ingredients, prepared in the restaurant rather than in a central kitchen. Chipotle has long promoted this model under slogans including "Food With Integrity" and "Real Food." The same model that Chipotle markets as a virtue also removes the cooking and processing steps that would otherwise destroy pathogens on produce, which Chipotle has known at all relevant times.

47.   **2015 — Minnesota, *Salmonella* Newport, fresh tomatoes.** In August and September 2015, at least 64 Minnesotans were sickened with *Salmonella* Newport after eating at 22 different Chipotle restaurants in Minnesota. Nine were hospitalized. Illness onsets ranged from

9

August 19 to September 3, 2015, and cases spanned 13 metropolitan counties and multiple areas of greater Minnesota. MDH and the Minnesota Department of Agriculture identified fresh tomatoes served at Chipotle as the source. Chipotle removed the implicated product and switched tomato suppliers.

48.     The 2015 Minnesota outbreak placed Chipotle on unmistakable notice that (a) *Salmonella* on raw produce was a live and recurring hazard in its restaurants, (b) its supplier vetting and verification systems were inadequate to prevent contaminated produce from reaching Minnesota consumers, and (c) Minnesota consumers in particular could be sickened in large numbers by a single contaminated produce lot moving through Chipotle's distribution system.

49.     **2015 — Seattle, *E. coli* O157:H7.** In July 2015, at least five customers of a Chipotle restaurant in Seattle, Washington were infected with *E. coli* O157:H7; three were hospitalized.

50.     **2015 — Simi Valley, California, norovirus.** In August 2015, more than 200 customers and employees became ill with norovirus after a Chipotle restaurant in Simi Valley, California allowed an ill employee to continue working in violation of its own policies.

51.     **2015 — Multistate, *E. coli* O26.** In the fall of 2015, two multistate outbreaks of *E. coli* O26 were linked to Chipotle restaurants across numerous states, sickening dozens of people and prompting a nationwide public health investigation and temporary restaurant closures.

52.     **2015 — Boston, Massachusetts, norovirus.** In December 2015, approximately 141 people, including members of the Boston College basketball team, became ill with norovirus after eating at a Chipotle restaurant in Boston. An ill employee had again been permitted or directed to continue working.

10

53.     **2017 — Sterling, Virginia, norovirus.** In July 2017, more than 135 people became ill with norovirus linked to a Chipotle restaurant in Sterling, Virginia.

54.     **2018 — Powell, Ohio, *Clostridium perfringens*.** In July and August 2018, approximately 647 people became ill after eating at a Chipotle restaurant in Powell, Ohio, in an outbreak of *Clostridium perfringens* attributed to a failure to maintain proper food holding temperatures.

55.     **2020 — The largest food safety fine in United States history.** On or about April 21, 2020, the United States Department of Justice announced that Chipotle Mexican Grill, Inc. had agreed to pay a $25 million criminal fine—described by the government as the largest fine ever imposed in a food safety case—to resolve a two-count criminal information charging Chipotle with violating the Federal Food, Drug, and Cosmetic Act by adulterating food. The charges arose from foodborne illness outbreaks between 2015 and 2018 that sickened more than 1,100 people. The matter was resolved through a deferred prosecution agreement under which Chipotle committed to implement and maintain an improved food safety compliance program.

56.     In announcing that resolution, the government stated that Chipotle "failed to ensure that its employees both understood and complied with its food safety protocols," and identified inadequate staffing, insufficient training, and pressure on employees to work while ill as root causes of the outbreaks.

57.     By no later than 2020, therefore, Chipotle possessed actual knowledge that: its food safety program had repeatedly failed; those failures had sickened more than a thousand people; the federal government had criminally charged it for serving adulterated food; and the company had formally undertaken—to the United States and to the public—to fix the problem. Chipotle nonetheless served Plaintiff *Salmonella*-contaminated produce in June 2026.

11

**Chipotle's Control Over Its Restaurants and Its Produce Supply Chain**

58.    At all relevant times, Chipotle owned, operated, staffed, trained, supervised, and controlled the Roseville Chipotle and its employees.

59.    At all relevant times, Chipotle developed, established, and required strict adherence to uniform operating standards, food safety protocols, recipes, menu specifications, ingredient specifications, and food handling and preparation procedures at all of its restaurants, including the Roseville Chipotle.

60.    At all relevant times, Chipotle selected, approved, contracted with, and required its restaurants to obtain produce and other ingredients from suppliers, growers, and distributors that Chipotle itself designated. Chipotle's restaurants, including the Roseville Chipotle, were not permitted to deviate from Chipotle's approved and mandated sources.

61.    At all relevant times, Chipotle designed, managed, and controlled the national and regional supply chain through which its restaurants—including the Roseville Chipotle—obtained the jalapeño peppers and other produce described in this Complaint.

62.    At all relevant times, Chipotle maintained and controlled an ingredient traceability system capable of identifying the specific lots of produce delivered to specific restaurants. Chipotle has publicly confirmed that it used that system during the 2026 outbreak investigation to identify the implicated jalapeño lot and the restaurants that received it.

63.    Chipotle therefore had the exclusive practical ability—and the corresponding duty—to select safe suppliers, to audit and verify those suppliers' food safety practices, to specify and enforce testing and certification requirements, and to reject produce that did not meet those requirements.

64.    Chipotle held the Roseville Chipotle out to the public, including Plaintiff, as a Chipotle restaurant bearing Chipotle's trademarks, signage, and trade dress, serving food prepared to Chipotle's standards. Plaintiff reasonably believed she was purchasing food from Chipotle and reasonably relied on the Chipotle brand and Chipotle's representations regarding the quality and safety of its food.

**Chipotle's Representations Regarding the Safety of Its Food**

65.    At all relevant times, Chipotle represented to the public and to its customers, including Plaintiff, that the food it prepared and sold was safe, wholesome, of high quality, and fit for human consumption.

66.    Chipotle made these representations through its advertising, its menu boards, its website and mobile application, its in-restaurant signage and displays of fresh ingredients, its "Food With Integrity" branding, and by the simple act of offering food for sale to the public for immediate consumption.

67.    Following its 2015 through 2018 outbreaks and its 2020 deferred prosecution agreement, Chipotle publicly and repeatedly represented that it had overhauled its food safety program, that it had implemented industry-leading supplier verification and ingredient testing protocols, and that its food was safe.

68.    Plaintiff was aware of and relied upon Chipotle's representations regarding the safety and quality of its food in deciding to purchase and consume the food that injured her.

69.    Chipotle's representations were false. The food Chipotle sold to Plaintiff was neither safe nor fit for human consumption. It was adulterated with a virulent human pathogen.

**The 2026 *Salmonella* Javiana Outbreak Linked to Chipotle**

70.     Beginning in or about mid-June 2026, MDH detected a cluster of *Salmonella* Javiana infections among Minnesota residents.

71.     Through WGS performed at the Minnesota Public Health Laboratory and the CDC, public health scientists determined that the isolates recovered from these patients were genetically indistinguishable or closely related, establishing that the patients had been infected with a single outbreak strain from a common source.

72.     The outbreak strain corresponds to NCBI Pathogen Detection SNP cluster PDS000268094, within the *Salmonella* pathogen detection release PDG000000002. That cluster is publicly available and is the genomic definition of this outbreak.

73.     As of the filing of this Complaint, SNP cluster PDS000268094 contains at least 327 isolates. Every isolate in the cluster is a clinical isolate—each was recovered from an infected human patient.

74.     The composition of the cluster is itself significant in two respects. First, 327 sequenced human infections is a figure substantially exceeding the illness counts that have been publicly acknowledged to date, which confirms that the scope of this outbreak is larger than has been reported. Second, the complete absence of any food, ingredient, or environmental isolate within the cluster reflects that no sample of the contaminated product was ever recovered and tested by regulators—because Chipotle had already sold and served it to its customers.

75.     Upon information and belief, and based on public reporting, at least 110 Minnesota residents have been confirmed as part of this outbreak, and the FDA has associated at least 212 illnesses nationally with the outbreak strain of *Salmonella* Javiana.

14

76. Upon information and belief, reported illness onset dates in the outbreak range from on or about June 14, 2026 through on or about July 14, 2026.

77. Upon information and belief, of the Minnesota outbreak cases interviewed by MDH, approximately 75 of 84 reported eating at a Chipotle restaurant in the days before they became ill—a rate of exposure far exceeding what would be expected in the general population and constituting powerful epidemiologic evidence that Chipotle was the source of the outbreak.

78. Because public health authorities count only laboratory-confirmed cases, and because most people who contract salmonellosis never seek medical care, never submit a stool specimen, and are never captured by surveillance, the confirmed case count dramatically understates the true number of people Chipotle sickened in this outbreak. The CDC estimates that for every laboratory-confirmed *Salmonella* infection, approximately 29 infections go undiagnosed. Applied to the 327 sequenced clinical isolates in SNP cluster PDS000268094, that ratio implies that the true number of persons sickened in this outbreak is in the thousands.

79. Upon learning of the outbreak, Chipotle activated its ingredient traceability system. Chipotle publicly stated: "As part of our established health and safety protocols, upon learning of a potential outbreak, we immediately initiated our ingredient traceability system."

80. Through that traceability exercise, Chipotle identified jalapeño peppers from a single common lot as the likely vehicle of contamination. Chipotle removed those jalapeños from every restaurant that had received the implicated product and replaced them with peppers obtained from different growers.

81. The FDA has undertaken a traceback investigation into produce, including but not limited to jalapeño peppers, potentially contaminated with *Salmonella* Javiana in connection with this outbreak.

82. Chipotle's own conduct—identifying a common jalapeño lot, pulling that lot from its restaurants, and replacing it with product from different growers—is an admission that contaminated jalapeño peppers distributed through Chipotle's supply chain caused illness among its customers.

83. Jalapeño peppers are a standard ingredient in multiple items Chipotle prepares and serves raw to its customers, including its Fresh Tomato Salsa, its Roasted Chili-Corn Salsa, and its guacamole. Chipotle's own published guacamole recipe calls for one-half of a jalapeño pepper, seeds included, diced and added raw. A customer who orders any of those three items consumes raw jalapeño pepper.

84. Upon information and belief, the contaminated jalapeño peppers Chipotle identified were distributed to and served at the Roseville Chipotle during the outbreak period, including on June 24, 2026.

### Plaintiff Kristen Behne's Illness

85. On June 24, 2026, at approximately 6:00 p.m., Plaintiff's husband placed an order at the Roseville Chipotle for pickup on Plaintiff's behalf.

86. Plaintiff's portion of that order was a chicken burrito bowl containing white rice, black beans, guacamole, Fresh Tomato Salsa, Roasted Chili-Corn Salsa, sour cream, cheese, and romaine lettuce:



87.    The order confirmation identifies the pickup location as the Roseville Chipotle at Fairdale Shoppes, 2325 Fairview Avenue North, Roseville, Minnesota 55113:



88.    Three separate components of the bowl that Chipotle prepared and sold to Plaintiff—the Fresh Tomato Salsa, the Roasted Chili-Corn Salsa, and the guacamole—contain raw jalapeño pepper as a standard ingredient.

17

89.    Plaintiff consumed that food on the evening of June 24, 2026, and consumed the remainder as leftovers the following day. She therefore ingested raw jalapeño pepper prepared and served by Chipotle on two separate occasions within the outbreak window.

90.    Late in the evening of June 27, 2026—approximately seventy-six hours after her first exposure, and squarely within the recognized six-hour-to-six-day incubation period for salmonellosis—Plaintiff's illness began. Her first symptom was syncope. She lost consciousness.

91.    Fever, chills, muscle aches, joint pain, abdominal cramping, and vomiting followed. Her temperature reached 102 degrees Fahrenheit.

92.    By the following day, Plaintiff's diarrhea had become severe. She experienced more than ten episodes of diarrhea in a twenty-four-hour period.

93.    On the evening of June 28, 2026, Plaintiff presented to the emergency department at M Health Fairview St. John's Hospital in Maplewood, Minnesota. On arrival her temperature was 102.3 degrees Fahrenheit, her heart rate was 145 beats per minute, and her respiratory rate was 22 breaths per minute.

94.    Plaintiff's presentation was severe enough that the differential diagnosis her treating physician documented included sepsis, pulmonary embolism, myocarditis, pericarditis, diabetic ketoacidosis, and appendicitis. She underwent chest radiography, computed tomography angiography of the chest, and computed tomography of the abdomen and pelvis.

95.    The computed tomography of Plaintiff's abdomen and pelvis demonstrated colitis—inflammation of the colon—with liquid colon contents extending to the rectum and exaggerated mucosal enhancement throughout the colon and rectum.

96.     Plaintiff's laboratory studies showed a markedly elevated C-reactive protein of 92, an elevated erythrocyte sedimentation rate, hyponatremia, and an increased anion gap metabolic acidosis.

97.     Plaintiff received antipyretics and two liters of intravenous fluid. Her tachycardia improved only transiently. Twelve hours after her arrival her heart rate remained between approximately 130 and 141 beats per minute. Two sets of blood cultures were drawn and she was administered intravenous ceftriaxone.

98.     Plaintiff was admitted to the hospital on June 28, 2026. On admission she was tachycardic and dehydrated, and she was diagnosed with sepsis.

99.     Sepsis is the body's overwhelming and dysregulated response to infection. It is a medical emergency and a recognized cause of death.

100.    During her hospitalization Plaintiff continued to experience diarrhea and vomiting and was unable to maintain adequate oral intake. She developed hyponatremia, hypokalemia, hypomagnesemia, and an increased anion gap metabolic acidosis, each of which required intravenous hydration and electrolyte repletion. She was treated with ciprofloxacin.

101.    Plaintiff was discharged on June 30, 2026. Her discharge diagnoses were *Salmonella* enteritis as the principal diagnosis, together with colitis, hyponatremia, increased anion gap metabolic acidosis, dehydration, sepsis, sinus tachycardia, hypokalemia, and hypomagnesemia. She remained tachycardic at the time of her discharge.

102.    A stool specimen collected on June 28, 2026 was culture-positive for *Salmonella*. The isolate was forwarded to the Minnesota Department of Health Public Health Laboratory, where it was assigned state laboratory isolate number H26-03595.

103.    Further characterization identified the organism as *Salmonella enterica* serotype Javiana—the same serotype responsible for the 2026 outbreak linked to Chipotle.

104.    Plaintiff's clinical isolate was whole genome sequenced and submitted to the CDC's PulseNet network and to the NCBI Pathogen Detection system, where it was assigned the isolate designation PNUSAS585266.

105.    NCBI's phylogenetic analysis placed Plaintiff's isolate, PNUSAS585266, within SNP cluster PDS000268094—the same cluster that comprises the *Salmonella* Javiana outbreak described in this Complaint.

106.    Plaintiff was therefore infected with the outbreak strain. Her infection is not merely consistent with the Chipotle outbreak; it is genomically part of it, as determined by federal public health scientists using the accepted scientific method for making that determination.

107.    MDH reached the same conclusion independently. In its Reportable Enteric Pathogen Case Report Form for Plaintiff, MDH recorded her illness as outbreak-associated, identified the outbreak by name as the *Salmonella* Javiana outbreak, and classified Plaintiff as a confirmed case. MDH completed that case report on July 1, 2026.

108.    MDH interviewed Plaintiff regarding her food exposures in the days before the onset of her illness as part of its outbreak investigation. Although Plaintiff did not recall eating at Chipotle during her initial interview, a subsequent outbreak-specific interview—aided by review of her household's order records—confirmed that she had eaten food from the Roseville Chipotle on June 24, 2026.

109.    Plaintiff's illness matches this outbreak in every material respect: infection with the outbreak strain itself, confirmed by whole genome sequencing and federal cluster assignment; classification by MDH as an outbreak-associated case; an exposure date and an onset date squarely

20

within the outbreak window; an exposure at a Chipotle restaurant; and consumption of the specific raw produce item that Chipotle itself identified, traced, and pulled from its restaurants.

110. When MDH interviewed Plaintiff on July 1, 2026—two days after her discharge from the hospital and a full week after her exposure—her illness had not resolved. MDH recorded both the duration of her diarrhea and her recovery as ongoing.

111. Plaintiff's health has not returned to its pre-illness baseline. She continues to experience the effects of her acute *Salmonella* infection and her septic episode, and is at increased risk of well-recognized post-infectious sequelae, including reactive arthritis and post-infectious irritable bowel syndrome.

112. As a direct and proximate result of consuming contaminated food that Chipotle prepared, sold, and served to her, Plaintiff suffered a severe, painful, and debilitating illness; endured hospitalization and sepsis; incurred and will incur medical and medical-related expenses; suffered lost income and lost earning capacity; endured and will endure physical pain, mental anguish, emotional distress, and loss of enjoyment of life; and sustained other losses and damages to be proved at trial.

## COUNT I — STRICT PRODUCT LIABILITY

113. Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

114. Chipotle manufactured, prepared, processed, marketed, distributed, served, and sold the adulterated food that caused Plaintiff's illness.

115. The food Chipotle served and Plaintiff consumed was contaminated with *Salmonella* Javiana when it left Chipotle's control.

116.   Plaintiff's consumption of that contaminated food caused her to become infected with *Salmonella* Javiana and to develop salmonellosis and sepsis.

117.   Food contaminated with *Salmonella* is dangerous to any person who eats it, and is particularly dangerous to children, the elderly, pregnant women, and persons with compromised immune systems.

118.   Because *Salmonella* is colorless, odorless, and tasteless, consumers such as Plaintiff have no ability to detect the contamination or to protect themselves from it.

119.   The food Chipotle prepared, served, and sold to Plaintiff was therefore defective and unreasonably dangerous to the ordinary consumer when it left Chipotle's control, and it reached Plaintiff without substantial change in that condition.

120.   The food Chipotle served to Plaintiff was accompanied by no warning of any kind.

121.   Chipotle is strictly liable to Plaintiff for the harm proximately caused by its manufacture, preparation, and sale of defective and unreasonably dangerous food, and for its failure to warn of foreseeable risks to ordinary consumers.

122.   As a direct and proximate result of Chipotle's production and sale of a defective product and its failure to warn, Plaintiff sustained the injuries and damages set forth in the preceding paragraphs.

## COUNT II — NEGLIGENCE

123.   Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

124.   Chipotle manufactured, prepared, processed, marketed, served, and sold food contaminated with *Salmonella*, a dangerous and potentially deadly human pathogen.

125. Chipotle owed a duty to all patrons who consume its products, including Plaintiff, to prepare and sell food that is safe to eat, that is not adulterated with pathogens such as *Salmonella*, and that is produced in compliance with applicable food safety regulations and industry standards.

126. Given its own documented history of foodborne illness outbreaks—including a *Salmonella* outbreak traced to fresh produce served at Chipotle restaurants in Minnesota in 2015— and given the well-known association between fresh peppers and *Salmonella* contamination, Chipotle's duty of care included a heightened obligation to vet, audit, verify, and monitor the growers and suppliers of the raw produce it served to the public.

127. Chipotle breached the duties it owed to Plaintiff by, among other things:

    a. Failing to adequately select, vet, qualify, audit, and monitor the growers, packers, processors, and distributors that supplied the raw produce served in its restaurants;

    b. Failing to require, obtain, and verify adequate food safety documentation, certifications, and pathogen testing results from its produce suppliers;

    c. Failing to adopt, implement, validate, and enforce supplier verification and preventive control programs meeting industry standards and applicable federal regulations for the sourcing of ready-to-eat produce;

    d. Purchasing, accepting, and serving raw produce contaminated with *Salmonella*;

    e. Failing to adequately maintain and monitor the safety of its products, premises, equipment, and employees;

    f. Failing to properly operate its restaurants in a safe, clean, and sanitary manner;

    g. Failing to adopt, implement, and follow adequate food safety policies and procedures;

h.  Failing to apply its own food safety policies and procedures so as to ensure the safety and sanitary condition of its food products, premises, and employees;

i.  Failing to properly train its employees and agents in the prevention of the transmission of *Salmonella*;

j.  Failing to properly staff and supervise its restaurants and its employees and agents so as to prevent the transmission of *Salmonella*;

k.  Failing to heed the lessons of its own prior outbreaks and of its 2020 deferred prosecution agreement with the United States;

l.  Failing to warn Plaintiff and other consumers of the risk of *Salmonella* contamination in the raw produce it served; and

m.  Otherwise failing to exercise reasonable care under the circumstances.

128.  Plaintiff's injuries were a direct and proximate result of Chipotle's negligence.

129.  As a direct and proximate result of Chipotle's negligence, Plaintiff sustained the injuries and damages set forth in the preceding paragraphs.

### COUNT III — NEGLIGENCE *PER SE* — Minn. Stat. § 31.02 *et seq.*

130.  Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

131.  Chipotle, its employees, agents, and those working on its behalf, as manufacturers and providers of food products within the State of Minnesota, owed a duty to comply with Minn. Stat. ch. 31.

132.  The Minnesota Food Law, Minn. Stat. § 31.02 *et seq.*, prohibits, among other things:

24

a. The manufacture, sale, delivery, holding, or offering for sale of any food that is adulterated or misbranded;

b. The adulteration or misbranding of any food; and

c. The receipt in commerce of any food that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise.

133. Food is adulterated under Minnesota law if it bears or contains any poisonous or deleterious substance that may render it injurious to health. The food Chipotle sold to Plaintiff bore and contained *Salmonella* Javiana and was therefore adulterated.

134. Plaintiff is a member of the class of persons the Minnesota Food Law was enacted to protect, and the injuries she suffered are of the type the statute was enacted to prevent.

135. Chipotle, its employees, agents, and those working on its behalf failed to comply with Minn. Stat. ch. 31. That conduct constitutes negligence *per se*.

136. As a direct and proximate result of Chipotle's failure to comply with Minn. Stat. ch. 31, Plaintiff sustained the injuries and damages set forth in the preceding paragraphs.

## COUNT IV — DAMAGES

137. Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

138. As a direct and proximate result of the acts and omissions of Chipotle set forth in this Complaint, Plaintiff has suffered and will continue to suffer general, special, incidental, and consequential damages in an amount to be proved at trial, including but not limited to:

a. Past and future medical, hospital, pharmaceutical, diagnostic, and related expenses;

b. Past and future physical pain, discomfort, and disability;

c. Past and future mental anguish, emotional distress, and fear of recurrence;

25

    d.   Past and future loss of enjoyment of life;

    e.   Past and future lost wages, lost income, and diminished earning capacity;

    f.   Past and future household services and out-of-pocket expenses, including travel and travel-related expenses; and

    g.   All other ordinary, incidental, or consequential damages reasonably anticipated to arise under the circumstances.

139.    Plaintiff reserves the right to seek leave to amend this Complaint to assert a claim for punitive damages pursuant to Minn. Stat. §§ 549.20 and 549.191 upon completion of discovery into Chipotle's knowledge of the risks described herein and its conduct in the face of that knowledge.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Kristen Behne respectfully prays for judgment against Defendant Chipotle Mexican Grill, Inc. as follows:

    a.   For compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), to be determined by the trier of fact;

    b.   For pre-judgment and post-judgment interest as allowed by law;

    c.   For her costs, disbursements, and expenses incurred herein;

    d.   For attorneys' fees to the extent permitted by law; and

    e.   For such other and further relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**OFT FOOD SAFETY & INJURY LAW PLLC**

Dated: August 5, 2026

By*: s/ Ryan Osterholm*
Ryan Osterholm (MN #0390152)
Brendan Flaherty (MN #0327657)
800 LaSalle Avenue, Suite 2260
Minneapolis, MN 55402

**NICOLET LAW OFFICE, S.C.**

Lindsay C. Lien Amin (MN #397560)
517 2nd Street, Unit 205
Hudson, Wisconsin 54016
Telephone: (715) 377-2141
Facsimile: (715) 598-6188
lindsay@nicoletlaw.com

*Attorneys for Plaintiff*